### In re QUINTUS SECURITIES LITIGATION.

### In re Copper Mountain Networks Securities Litigation.

### Nos. C–00–4263 VRW, C–00–3894 VRW.

United States District Court,
N.D. California.

May 31, 2001.

Francis M. Gregorek, Francis A. Bottini, Jr., Betsy C. Manifold, Wolf, Haldenstein, Adler, Freeman & Herz, LLP, San Diego, CA, Lawrence G. Soicher, Law Offices of Lawrence G. Soicher, New York City, for Ariel Hernandez.

Eduard Korsinsky, Daniel A. Osborn, Beattie and Osborn, LLP, New York City, for Quinton Barton.

Philip C. Tencer, William E. Grauer, Cooley Godward, LLP, San Diego, CA, for defendants.

William S. Lerach, Darren J. Robbins, Milberg, Weiss, Bershad, Hynes & Lerach, LLP, San Diego, CA, Patrick J. Coughlin, Milberg, Weiss, Bershad, Hynes & Lerach, LLP, San Francisco, CA, Peter D. Bull, Bull & Lifshitz, New York City, Samuel P. Sporn, Joel P. Laitman, Christopher Lometti, Schoengold & Sporn, P.C., New York City, for Fred Werner.

## ORDER

WALKER, District Judge.

Under F.R.C.P. 23, the court, lead plaintiff and class counsel are fiduciaries for absent class members. Although their respective roles differ, each of these fiduciaries must undertake to ensure that the class receives competent representation at a fair cost.

Plaintiff Quinn Barton afforded such representation for the class in *Copper Mountain* and hence was designated lead plaintiff in that litigation. Barton did this by engaging qualified lawyers to serve as class counsel on terms that were advantageous to the class. Because none of the prospective lead plaintiffs in *Quintus* did this, the court appointed Colin Barry Hill as a nominal lead plaintiff and undertook a competitive selection of lead counsel. The court received bids from five law firms: Beatie & Osborn LLP (Beatie); Berman DeValerio Pease & Tabacco, PC (Berman); Cohen, Milstein, Hausfeld & Toll, PLLC (Cohen); Lieff, Cabraser, Heimann & Bernstein, LLP (Lieff); and Weiss & Yourman (Weiss). Milberg Weiss Bershad Hynes & Lerach LLP (Milberg), which had filed some of the *Quintus* complaints, did not submit a bid. But because Milberg had sought to represent the class, the terms of its proposed representation are considered herein and compared to those of the other firms. This order designates Weiss to represent the class in *Quintus* and further explains the court's designation of Barton to serve as lead plaintiff in *Copper Mountain*.

I

The designation of lead plaintiff and lead counsel in these private class action cases is guided by the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 77z–1 et seq., § 78u–4 et seq. The PSLRA did not alter the requirements of F.R.C.P. 23 in class actions alleging violations of the federal securities laws. See James Wm. Moore, 5 *Moore's Federal Practice* § 23.25[6] (3d ed. 2000) ("[T]he provisions of the [PSLRA] do not replace the ordinary requirements of Rule 23."); see also House Conference Report No. 104–369, 104th Congress, reprinted in 1995 U.S.C.C.A.N. 730, 733 ("The provisions of the bill relating to the appointment of lead plaintiff are not intended to affect current law with regard to challenges to the adequacy of the class representative or typicality of the claims among the class.").

The PSLRA merely supplements F.R.C.P. 23.

Thus, the selection of lead plaintiff continues to be governed by F.R.C.P. 23. The PSLRA makes this clear. The PSLRA's rebuttable presumption in favor of the class member having the largest claimed loss may only be invoked by a plaintiff who "satisfies the requirements of Rule 23 * * *." 15 U.S.C. § 77z–1(3)(B)(iii)(I)(cc), § 78u–4(a)(3)(B)(iii)(I)(cc). Hence, if the class member having the largest claimed loss fails to meet the F.R.C.P. 23 requirements, the court cannot designate that class member to serve as lead plaintiff. The PSLRA also instructs that the presumption may be rebutted if the presumptive lead plaintiff "will not fairly and adequately protect the interests of the class." 15 U.S.C. § 77z–1(a)(3)(B)(iii)(II)(aa), § 78u–4(a)(3)(B)(iii)(II)(aa).

Similarly, the requirements of F.R.C.P. 23 continue to govern the selection of lead counsel. Under the PSLRA, the court is obligated to scrutinize a proposed lead plaintiff's selection of counsel to represent the class. 15 U.S.C. § 77z–1(a)(3)(B)(v), § 78u–4(a)(3)(B)(v). In sum, the provisions of the PSLRA are consistent with and derived from the fiduciary obligations of the court, the lead plaintiff and the lead counsel that are mandated by F.R.C.P. 23.

■ Because F.R.C.P. 23's requirements continue to apply after the passage of the PSLRA, the court must examine the contours of those requirements. Under F.R.C.P. 23(a)(4), the court may not certify a class action unless it concludes that "the representative parties will fairly and adequately protect the interests of the class." The court thus owes a fiduciary duty to the class to ensure that the interests of every member of the class are adequately represented. This requirement of adequate representation is intended to protect the due process rights of absent class members See *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1020 (9th Cir.1998) (citing *Hansberry v. Lee,* 311 U.S. 32, 42–43, 61 S.Ct. 115, 85 L.Ed. 22 (1940)).

In deciding whether representation is adequate in a given case, the court must evaluate both the adequacy of the proposed lead plaintiff and the adequacy of the proposed lead counsel. *Crawford v. Honig,* 37 F.3d 485, 487 (9th Cir.1994) ("Adequate representation depends on the qualifications of counsel for the representatives, an absence of antagonism, a sharing of interests between representatives and absentees, and the unlikelihood that the suit is collusive.") (citation and internal punctuation omitted); see also *Local Joint Executive Bd. v. Las Vegas Sands, Inc.,* 244 F.3d 1152, 1162 (9th Cir.2001) (citing *Crawford*). The court's obligation to evaluate the adequacy of the class representative and counsel continues throughout the litigation. See *Foe v. Cuomo,* 892 F.2d 196, 198 (2d Cir.1989).

In the first instance, the adequacy requirement applies to the lead plaintiff. A lead plaintiff in a class action owes a fiduciary duty to the class. See *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 549–550, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949). For this reason, a putative lead plaintiff must demonstrate ability to discharge the fiduciary duty to the class. *Wagner v. Lehman Bros. Kuhn Loeb Inc.,* 646 F.Supp. 643, 661 (N.D.Ill.1986). If the putative lead plaintiff gives the court any reason to doubt the ability to meet these fiduciary obligations, class certification may be denied. *Id.* For example, the lead plaintiff must possess interests that are not in conflict with the interests of the class and must endeavor actively to pursue the litigation. See *Welling v. Alexy,* 155 F.R.D. 654, 659 (N.D.Cal.1994) (named plaintiff deemed inadequate due, in part, to

his lack of interest in supervising the attorneys).

■ Additionally, a lead plaintiff has an obligation to seek to maximize the class' recovery. This entails hiring competent counsel at a fair fee. The obligation flows directly from the lead plaintiff's role as a fiduciary to the class. Fiduciary duties, of course, are not peculiar to securities class actions. In fact, the fiduciary duties of trustees and corporate directors are more well known and better defined than those of the lead plaintiff in class actions. For this reason, it makes sense to look to the fiduciary duties owed by trustees and corporate directors to understand more fully the duties owed by a lead plaintiff.

The decision to hire class counsel on a contingency basis to pursue common fund claims on behalf of a class is tantamount to a decision to sell to counsel a portion of the class' claim in return for counsel's services. In this way, selection of counsel is analogous to the sale of an asset by a trustee or a decision by a corporation's directors to put the corporation up for sale. In both these instances, the trustees and directors' fiduciary duties require them to take steps to secure a fair price for the asset being sold.

It is well established that a trustee's duty to obtain a fair price is measured by what the asset could command when exposed to a competitive sale. "The principal object of [a] sale is to obtain the maximum price." George Gleason Bogert & George Taylor Bogert, *Trusts and Trustees* § 745 at 473 (2d revised ed.). This goal of price maximization means that if the trustee "sells [ ] property at a private sale, he should not accept a price that is less than the price that he could reasonably expect to receive; and if he sells at auction, he should take care to secure a proper amount of bidding." William R Fratcher, *Scott on Trusts* § 208.6 at 272

(4th ed.). "If the trustee is guilty of a breach of trust in selling trust property for an inadequate price, he is liable for the difference between the amount he should have received and the amount that he did receive." *Id.* at 272–73.

A trustee's fiduciary duties may require a trustee to seek competitive bidding to secure a fair price for an asset to be sold. One commentator writes: "The trustee should do his best to secure competitive bidding * * *." Bogert, *Trusts and Trustees* § 745 at 473; see also *InterFirst Bank Dallas, N.A. v. Risser,* 739 S.W.2d 882 (Tex.App.1987) ("A trustee's duty of loyalty and reasonable care dictates that it must seek the best price obtainable for trust property which it is selling. Furthermore, the trustee should secure competitive bidding and surround the sale with such other factors as will tend to cause the property to sell to the greatest advantage.") (citing Bogert).

Similarly, corporate directors' fiduciary duties require them to hold competitive auctions in some situations to ensure that shareholder return is maximized. A noteworthy example of this arises in the context of a takeover attempt. In a groundbreaking decision, *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* 506 A.2d 173 (Del.1986), the Delaware Supreme Court held that the directors of Revlon breached their fiduciary duties to Revlon shareholders by taking actions to prevent open and competitive bidding for the corporation. The court held that once the company was "for sale," the duty of the Revlon board changed from "the preservation of Revlon as a corporate entity to the maximization of the company's value at a sale for the stockholders' benefit." *Id.* at 182. "The directors' role changed from defenders of the corporate bastion to auctioneers charged with getting the best price for

the stockholders at a sale of the company." *Id.*

In both these scenarios, the sale of an asset by a trustee and the sale of a corporation by the directors, the trustees and directors' fiduciary duties require the use of competitive processes to ensure a fair price for the item on sale. So too it is with selection of lead counsel by the lead plaintiff.

Counsel seeking to represent the class also have a fiduciary obligation to the class. *Wagner*, 646 F.Supp. at 661. As the Ninth Circuit has noted, the adequacy of a party seeking to represent a class is related to the party's choice of class counsel. *Local Joint Executive Bd.*, 244 F.3d at 1162 ("The competence of counsel seeking to represent a class is also an appropriate consideration under Rule 23(a)(4) [governing selection of lead plaintiff]."). Lead counsel must be "qualified, experienced and able to vigorously conduct the proposed litigation" on behalf of the class. *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir.1985), cert. denied, 476 U.S. 1172, 106 S.Ct. 2896, 90 L.Ed.2d 983 (1986). Additionally, counsel's fiduciary obligations to the class require counsel to charge only a reasonable fee. *McKenzie Const., Inc. v. Maynard*, 758 F.2d 97, 100 (3rd Cir.1985) ("The allocation of the burden of proof is premised on the relationship of trust owed by a lawyer to his client, with a concomitant obligation to charge only a reasonable fee whether the arrangement be contingent or otherwise. This approach is at the very heart of the special relationship between attorney and client.").

In sum, both lead plaintiff and lead counsel have an obligation to enter into a fair fee arrangement. It is the court's independent obligation under F.R.C.P. 23 to ensure that this occurs. *Zucker v. Occidental Petroleum Corp.*, 192 F.3d 1323, 1328–29 (9th Cir.1999) ("In a class action,

whether attorneys' fees come from a common fund or are otherwise paid, the district court must exercise its inherent authority to assure that the amount and mode of payment of attorneys' fees are fair and proper. This duty of the court exists independently of any objection."). The court's obligation to ensure the reasonableness of counsel's fees stems also from its supervisory powers over the members of the bar. *Dunn v. H K Porter Co., Inc.*, 602 F.2d 1105, 1109 (3d Cir.1979).

■ In class actions, the court has an obligation not only to scrutinize the fee award but continually to monitor the selection and performance of lead plaintiff and lead counsel to ensure that adequate representation is afforded to the class. *In re Cendant Corp. PRIDES Lit.*, 243 F.3d 722, 731 (3d Cir.2001) ("Our interest and supervisory role is pervasive and extends not only to the final fee award but also to the manner by which class counsel is selected and the manner by which attorneys' fees conditions are established."). In this situation, the court has an affirmative obligation to attempt to prevent breaches by lead plaintiff and counsel of their duty to the class *before* they occur.

A fair reading of the PSLRA also establishes this obligation. The Act requires the court to make an assessment of the "most adequate plaintiff" to serve as lead plaintiff at the outset of the litigation. 15 U.S.C. § 77z–1(3)(B)(i), § 78u–4(3)(B)(i). The presumption in favor of the class member with the largest loss supplies one important element of this decision, but it is by no means the end of the inquiry. Judge Milton Shadur has illustrated this point by example:

Suppose for instance a plaintiff in such a presumptive status has agreed that its own lawyers, if acting as class counsel, are to receive one-third of any class recovery. Suppose further that another

highly reputable law firm that has appeared of record for another putative plaintiff or plaintiffs, having demonstrated excellent credentials in earlier securities class action litigation and being clearly capable of handling the complexities of the current lawsuit, is willing to handle the case for half of that percentage fee—or to provide even a greater contrast, is willing to work for that lesser percentage and also to impose a cap on the firm's total fee payment. In that circumstance the presumptive lead plaintiff could certainly bind itself contractually to pay one-third of its share of the class recovery to its own lawyer, but any court would be remiss if it were to foist that one-third contingency arrangement on all of the other class members who had not themselves chosen that law firm to be their advocate.

*In re Bank One Shareholders Class Actions*, 96 F Supp 2d 780, 784 (N.D.Ill.2000).

In considering counsel's bids to represent a class prospectively, the court's role differs from its role in cases involving breaches of duty by trustees and corporate directors. In those cases, the court is simply called upon after the fact to adjudicate an alleged breach that has already occurred. Here the court has both the opportunity and, as a result, the obligation to ensure that the breach never occurs by facilitating the selection of competent counsel at a fair price at the outset of the litigation.

It is well settled that in common fund cases the court has equitable power to award attorneys' fees and costs from the common fund. See *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980). The fee awarded must be "reasonable under the circumstances." *Florida v. Dunne*, 915 F.2d 542, 545 (9th Cir.1990). This is reiterated by the PSLRA: "Total attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of damages and prejudgment interest actually paid to the class." 15 U.S.C. § 77z–1(a)(6), § 78u–4(a)(6). At its discretion, the court may award fees under the lodestar method or percentage of the fund method. See *In re Washington Public Power Supply Sys. Lit.*, 19 F.3d 1291, 1297 (9th Cir.1994). Regardless of which method is employed, however, the court must ensure the reasonableness of the fee award and must "assume the role of fiduciary for the class of plaintiffs" since "the relationship between plaintiffs and their attorneys turns adversarial at the fee setting stage." *Id.* at 1302.

■ The lodestar method requires the court to multiply the "number of hours reasonably expended by a reasonable hourly rate." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir.1998). That figure, the lodestar, may then be "adjusted upward or downward to account for several factors including the quality of representation, the benefit obtained for the class, the complexity and novelty of the issues presented, and the risk of nonpayment." *Id.*

■ The percentage of the fund method requires the court to award counsel a certain percentage of the settlement. The percentage is to be set by the court with reference to the Ninth Circuit's "benchmark" of 25 percent. See *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir.1989); *Torrisi v. Tucson Electric Power Co.*, 8 F.3d 1370, 1376 (9th Cir.1993). The benchmark can be adjusted upward or downward but such an adjustment "must be accompanied by a reasonable explanation of why the benchmark is unreasonable under the circumstances." *Graulty*, 886 F.2d at 273. Factors relevant to an adjustment include the

quality of counsel, the benefits obtained for the class, the complexity of the issues, and the risk of nonpayment. See *In re Oracle Secs. Lit.*, 852 F.Supp. 1437, 1449 (N.D.Cal.1994).

Soliciting competitive bids from prospective lead plaintiffs is wholly consistent with this established procedure for awarding fees except, possibly, in one important respect. At the end of the case, the court still scrutinizes a requested fee award for reasonableness. See, e.g., *In re Oracle Secs. Lit.*, 852 F.Supp. at 1458–59; *In re California Micro Devices Sec. Lit.*, 94–2817–VRW (May 24, 2001, hearing). Fee proposals submitted to the court, lead plaintiff or both at the outset of litigation materially aid in that assessment by providing a competitively determined benchmark, not merely an arbitrary 25 percent benchmark. Firms that have submitted competitive bids have made an ex ante determination of the risks and opportunities of the litigation. Competition with other firms gives each firm the incentive to collect the best information possible. Due to their superior access to information, this ex ante determination is likely a more accurate benchmark determination than that which the court can reconstruct in the almost always non-adversarial fee presentations made at the conclusion of litigation or can divine from whatever sources produced the notion that 25 percent is a fair fee.

From the cases at bar and the numerous other cases in which competitive class counsel selection has occurred, see cases collected in the 4/12/01 order at 13–21, as well as many lodestar decisions, it appears that the 25 percent benchmark is often above the level of fees necessary to enlist competent counsel to prosecute securities class actions. See Keith L. Johnson and Douglas M Hagerman, *The Elephant in Securities Class Actions: Lessons Learned about Legal Fees*, 9 The Corporate Advisor at 8 (March/April 2001)[1]; see also Statement of William Lerach, State of California Public Employees' Retirement System Investment Committee, August 19, 1996, R. Tr. at 113 (referring to 13 Class Action Reports, July–August 1990, September–October 1999 at 556). Fees taken out of securities class action payments are a substantial cost to investors, exceeding some institutional investors' total budget for legal fees on all other matters. Johnson and Hagerman at 7. Adherence to an arbitrary 25 percent benchmark does not square with courts' fiduciary responsibilities to the class in the face of mounting evidence that this benchmark is often too high.

II

With these principles in mind, the court turns to the *Quintus* bids. In its April 12, 2001, order, the court requested that law firms interested in serving as class counsel in *Quintus* submit sealed bids to the court by May 14, 2001. The bids were to contain qualitative information about the firm's experience, the experience of the lawyers who would likely work on the case, the firm's malpractice insurance and the firms' evaluation of the case The bids were also to contain a fee proposal.

Firms were asked to specify the percentage of recovery they would take as fees for any given level of recovery. The court intended the fee proposals to take the sliding scale format familiar to everyone who has filled out a federal income tax form. Under the sliding scale approach,

---

**1.** The authors represent State of Wisconsin Investment Board (SWIB), manager of that state's public employees' retirement funds.

the fee percentage corresponding to the first \$4 million of recovery always applies to that \$4 million, even if recovery exceeds \$4 million. In that case, the first percentage applies to the first \$4 million and the next percentage applies to the amount over \$4 million, but below \$8 million. For example, under a fee proposal using the grid provided by the court, for a recovery over \$20 million, the fee is calculated as follows: Fee = (\$4 million * first percentage) + (\$4 million * second percentage) + (\$7 million * third percentage) + (\$5 million * fourth percentage) + ((recovery—\$20 million) * fifth percentage).

The fee proposals were also allowed to vary the percentage of recovery for recovery at one of four stages in the litigation: (1) from pleading through motion to dismiss (Stage 1); (2) after motion to dismiss through summary judgment (Stage 2); (3) after summary judgment through trial verdict (Stage 3); and (4) after trial verdict through final appellate determination (Stage 4). Finally, the court asked counsel to include costs in their share of the recovery.

All of the firms submitting bids have experience in prosecuting class actions on behalf of plaintiffs. And all of the firms appear capable of undertaking representation of a class of Quintus stock purchasers. Each firm submitted a detailed bid describing the firm's experience, the individual lawyers to be assigned to the litigation, the firm's malpractice coverage and its fee proposal. In this case, as in all cases in which the court has selected class counsel by competitive means, the court expressly considered the quality of representation offered. See *In re Oracle Sec. Lit.*, 132 F.R.D. 538, 542 (N.D.Cal.1990); *In re Wells Fargo Secs. Lit.*, 157 F.R.D. 467, 470–73 (N.D.Cal.1994); *Wenderhold v. Cylink Corp.*, 191 F.R.D. 600, 602–03 (N.D.Cal.2000). Some of the firms also provided a general evaluation of the litigation. The bids were submitted under seal to ensure their confidentiality up to the point of selection, but are, with this order, unsealed to assure transparency of the selection process. The task before the court is to evaluate the bids and select the firm that offers the best combination of quality and price for this representation.

*Beatie & Osborn.* Beatie is a relatively young firm, having been formed in 1998. It, therefore, lacks the extensive experience in numerous class actions that its competitors can cite. This is by no means fatal to Beatie's bid, but it would seem to call for a more detailed description of the firm's experience in the past three years than the firm provided. Beatie's description of the experience of the lawyers who would work on the case is also rather sparse. It does appear, however, that all three lawyers mentioned have either many years of litigation experience or experience specifically in securities cases. Beatie carries \$3 million of malpractice insurance. Additionally, Beatie's evaluation of the case is detailed and cogent.

Beatie submits the following fee proposal:

|  | Stage 1 | Stage 2 | Stage 3 | Stage 4 |
|---|---|---|---|---|
| \$0–\$4 mil | 0% | 0% | 0% | 30% |
| \$4–\$8 mil | 18% | 21% | 24% | 30% |
| \$8–\$15 mil | 15% | 18% | 21% | 30% |
| \$15–\$20 mil | 12% | 15% | 18% | 30% |
| Over \$20 mil | 10% | 13% | 16% | 25% |

The fee proposal is noteworthy in a number of respects. First, Beatie proposes to take no portion of the first \$4 million in recovery through Stage 3. The fee then descends as recovery increases and ascends as the litigation lengthens. The biggest jump occurs as the litigation moves forward into Stage 4, after a trial verdict.

Beatie explains the jump at Stage 4 as follows: "With respect to the stage of the litigation at which recovery is obtained, the proposed fee structure reflects a modest

ascending percentage, except with respect to trial, as it is our firm's view that obtaining a successful result through trial warrants additional consideration." Beatie Bid at 3. The reasoning makes sense but the fee proposal does not appear to fit the premise. Beatie has not markedly increased the percentage recovered for verdicts through trial (Stage 3). Rather, it has increased the percentage after trial through final appellate determination (Stage 4). In this way, Beatie's description of its fee proposal fails to correspond to its actual proposal. This disconnect suggests that Beatie has not fully analyzed its fee proposal in this case. Compare Section VI.

*Berman DeValerio Pease & Tabacco.* Berman's assessment of the case is detailed and thorough. The description of the firm's experience and the experience of the lawyers who will work on the case is adequate. It is more detailed than Beatie's, noting the firm's representation of the Colorado, Utah and Minnesota state pension funds in a securities action against McKesson/HBOC and of the Fresno County Retirement Association in *In re Warnaco Corp. Sec. Lit.,* in the Southern District of New York. The attached firm biography provides information about two of the firm's lawyers, Mr Tabacco and Mr Heffelfinger. Both appear to be accomplished in the area of securities litigation. Independent of Berman's bid, the court believes that Mr Tabacco, who practices in Berman's San Francisco office, enjoys a fine reputation in that legal community. The firm has malpractice insurance.

Berman's fee proposal is as follows:

| | Stage 1 | Stage 2 | Stage 3 | Stage 4 |
|---|---|---|---|---|
| $0–$4 mil | 0% * | 5% | 7% | 10% |
| $4–$8 mil | 5% | 8% | 10% | 15% |
| $8–$15 mil | 15% | 20% | 25% | 30% |
| $15–$20 mil | 10% | 15% | 20% | 25% |
| Over $20 mil | 8% | 12% | 15% | 20% |

* Expenses come out of the class' recovery up to $100,000.

The fee proposal is interesting in that the percentages of recovery first ascend and then descend as recovery increases. As the litigation goes forward, the percentages increase. Berman's explanation of its fee proposal makes sense. The percentage for small recovery is low because Berman believes that a recovery is likely in this case. As recovery increases, Berman's fee would increase due both to the increased recovery and to the increased percentage fee. But then, at increasingly higher recoveries, Berman's share of the recovery would decline "to insure that the Class receives a proportionally higher percentage of the recovery." Berman Bid at 6. In other words, at recoveries over $15 million, Berman would share the economies of obtaining those recoveries with the class. Berman's fees increase as the litigation progresses to reflect the added work necessary.

*Cohen, Milstein, Hausfeld & Toll.* Cohen's experience litigating large plaintiff class actions is impressive. Cohen describes seven major non-securities class actions it has prosecuted. Cohen also lists 25 securities class actions in which it has participated. Attached to the bid are biographies of the lawyers Cohen proposes to have work on the case. The backgrounds of Herbert E Milstein and Steven J Toll are particularly impressive. Cohen has malpractice insurance.

Cohen has submitted a good evaluation of the case. It discusses likely sources of recovery and issues related to liability. The discussion of defendants' liability, however, is somewhat vague.

Cohen's fee proposal is reproduced below:

| | Stage 1 | Stage 2 | Stage 3 | Stage 4 |
|---|---|---|---|---|
| $0–$4 mil | 13% | 17% | 19% | 20% |
| $4–$8 mil | 12.25% | 16.25% | 18.25% | 19.25% |
| $8–$15 mil | 11.5% | 15.5% | 17.5% | 18.5% |
| $15–$20 mil | 10.75% | 14.75% | 16.75% | 17.75% |
| Over $20 mil | 10% | 14% | 16% | 17% |

The fee proposal is not particularly striking in any respect. The percentages decrease as recovery increases but increase as the litigation progresses. The decreases and increases are both modest.

Cohen explains that the decrease as recovery increases is meant to share the economies of scale with the class and that the increase as the litigation progresses reflects the necessary extra effort by counsel. This explanation is quite reasonable.

*Lieff, Cabraser, Heimann & Bernstein.* Lieff's extensive experience in securities class actions is amply described in the firm's resume attached with its bid. Lieff lists 11 securities class actions and numerous other plaintiff class action cases in which it has participated. There can be no doubt that Lieff has a great deal of experience in this area. The lawyers from the firm that would work on this case are equally impressive. The backgrounds of Elizabeth Cabraser and James Finberg are particularly noteworthy. Additionally, Lieff carries malpractice insurance.

Lieff's assessment of the case is clear and appears to reflect significant thought and research into the case. In particular, Lieff explores the possible recovery against Quintus' auditor.

Lieff's fee proposal is as follows:

|  | Stage 1 | Stage 2 | Stage 3 | Stage 4 |
|---|---|---|---|---|
| $0–$4 mil | 12% | 18% | 22% | 23% |
| $4–$8 mil | 11% | 17% | 21% | 22% |
| $8–$15 mil | 10% | 16% | 20% | 21% |
| $15–$20 mil | 9% | 15% | 19% | 20% |
| Over $20 mil | 8% | 14% | 18% | 19% |

Lieff proposes to pay litigation costs, but not settlement costs. This is a distinction the previously discussed bids did not make, but it is a reasonable one as settlement costs (e g, costs of notice to the class, settlement administration, etc) are largely beyond the control of counsel, unlike litigation costs. The fee percentages descend slightly as recovery increases and ascend sharply as the litigation progresses. The

jump from Stage 3 to Stage 4 is the smallest of the three jumps. Lieff's explanation of the fee structure is quite logical. Lieff explains that the rising fee as the case progresses reflects the extra work involved. Since preparing for summary judgment takes the most effort, the jump from Stage 1 to Stage 2 is the greatest. The jump from Stage 3 to 4 is small because briefing an appeal takes comparatively little work. Compare Beatie's Fee Proposal. Finally, Lieff explains that a "declining percentage [as recovery increases] reduces the chance of an attorneys' fee that is widely disproportionate to lodestar." Lieff Bid at 5.

*Weiss & Yourman.* The Weiss firm's bid describes an accomplished plaintiff class action firm. It lists 15 securities class actions in which it is currently serving as lead or co-lead counsel. Weiss also details a number of large settlements it has achieved for classes in cases in which it has served as lead or co-lead counsel. The list includes a $550 million recovery from the state of California and a $200 million recovery in the Geodyne Resources securities case. The attached firm resume lists 31 securities class actions. The lawyers who would work on the case, Kevin J. Yourman, Jordan L. Lurie and Mark Gordon, appear to have excellent experience. Yourman has been involved in numerous securities class actions and Lurie has given seminars on securities fraud class actions.

Weiss' analysis of the case is thorough. Weiss discusses defendants' liability and potential avenues of recovery. Like Lieff, Weiss notes the possibility of recovery from Quintus' auditor. Weiss also states that it has consulted a forensic accountant in furtherance of a claim against the auditor. Weiss does not mention recovery against Avaya, Inc, something mentioned by all the other firms.

Weiss proposes the following fee:

|            | Stage 1 | Stage 2 | Stage 3 | Stage 4 |
|------------|---------|---------|---------|---------|
| $0–$4 mil  | 7.5%    | 8.5%    | 9%      | 9%      |
| $4–$8 mil  | 7%      | 8%      | 8.5%    | 8.5%    |
| $8–$12 mil | 6.5%    | 7.5%    | 8%      | 8%      |
| $12–$16 mil| 6%      | 7%      | 7.5%    | 7.5%    |
| $16–$20 mil| 5.5%    | 6%      | 6.5%    | 6.5%    |
| Over $20 mil| 5%     | 5.5%    | 6%      | 6%      |

A negative feature of Weiss' proposal is its treatment of so-called litigation costs. Weiss' fee proposal requires the class to pay for costs out of its share of the recovery up to $150,000 in Stages 1 and 2 and up to $300,000 in Stages 3 and 4. By excluding costs, the fee percentages are made artificially low. Like Lieff, Weiss specifies that settlement costs are to be borne by the class. While Weiss' deviation from the proposal format the court requested makes comparison of the proposals more difficult, it does not prevent such a comparison. In section IV of this order, the court describes the quantitative comparison it undertook.

Weiss' proposal is noteworthy in another respect. Weiss did not use the recovery amount breakpoints the court specified in Appendix B to the April 12, 2001, order. Instead, Weiss added another category. Fortunately, this deviation also did not impair the court's ability to compare the proposals.[2]

Weiss' explanation of its fee arrangement is sensible. I has employed a fee percentage structure that decreases as recovery increases in order to "tak[e] into account the economies of effort for increasing amounts of recovery." Weiss Bid at 7. The percentages increase as the litigation progresses to reflect increased attorney effort. But no increase is made from Stage 3 to 4 since, Weiss explains, compar-atively little additional effort is required to take a case through appeal. Additionally, Weiss explains the sliding scale nature of its fee structure. All the proposals employ this approach, although not all explicitly acknowledge the point since it was implicit in the court's request for proposals.

Finally, the court notes that Weiss does not have malpractice insurance. The firm is self-insured. This is a qualitative negative.

*Milberg Weiss Bershad Hynes & Lerach.* Milberg did not submit a formal bid so the court does not have a case evaluation from Milberg. But the court does have available much of the information necessary to compare Milberg's proposed representation with that offered by the other firms.

Milberg's experience in securities class actions is substantial; indeed, its position in this practice is unrivaled. A comprehensive analysis of securities class action settlements recently completed shows that Milberg filed 31 percent of all securities class action filings in federal and state courts from 1988 to 1999 as reported in Securities Class Action Alert and for which the class period could be defined and potential investment loss data were available. See Mukesh Bajaj, Sumon C. Mazumdar & Atulya Sarin, *Securities Class Action Settlements; An Empirical Analysis* at 13, 33 tbl. 16 (November 16, 2000) (hereinafter *Haas Study* )[3], available at http://securities2.stanford. edu/research/studies/20001116_SSRN_Baja.html. No other firm comes close to having this market share.

---

**2.** The relative ease with which the court compared Weiss' proposal with the others that followed the proscribed structure causes the court to question whether an imposed structure is necessary at all. See *In re Bank One Shareholders Class Actions*, 96 F.Supp.2d 780, 787 (N.D.Ill.2000) (Shadur, J.).

**3.** Two of the authors are associated with Haas School of Business University of California at Berkeley; the third co-author teaches at Leavey School of Business, Santa Clara University.

Milberg's web site provides a lengthy list of securities class actions in which Milberg is currently involved. See http://www.milberg.com, visited May 21, 2001. The listing of *Copper Mountain* and *Quintus* indicates that the firm's involvement in each listed case may not be extensive, but it cannot be questioned that Milberg is very experienced in the field. Furthermore, the lawyer for Milberg who represented Hill during the lead plaintiff selection phase of this case, Jeffrey W. Lawrence, appears to have gained experience in this area as an Assistant United States Attorney. See www.milberg.com/attorneys/partners/Jeffrey_Lawrence.html. Patrick Coughlin, the senior Milberg lawyer on these cases, is highly able and well known in the field.

Milberg proposed the following fee:

|  | Stage 1 | Stage 2 | Stage 3 | Stage 4 |
|---|---|---|---|---|
| $0–$4 mil | 5% | 5% | 5% | 5% |
| $4–$8 mil | 12.5% | 12.5% | 12.5% | 12.5% |
| $8–$15 mil | 17.5% | 17.5% | 17.5% | 17.5% |
| $15–$20 mil | 22.5% | 22.5% | 22.5% | 22.5% |
| Over $20 mil | 30% | 30% | 30% | 30% |

The most noteworthy features of the Milberg proposal appear to be that the percentage recovery does not vary with the stage of the litigation in which recovery occurs and that the percentages increase as recovery increases. At the hearing, Milberg explained that the increasing percentage provides the firm with an incentive to maximize the class' recovery, a point the court will discuss presently.

### III

While all the firms appear fully capable of handling the *Quintus* litigation, the bids submitted reveal some qualitative differences. The quality of the bids themselves differed among firms. In gauging the quality of a law firm, the court may consider the quality of the pleadings the firm submits. Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, 7A *Federal Practice and Procedure* § 1769.1 at 376–378 ("The competence of counsel may be shown by the quality of the briefs, as well as the arguments presented by the attorneys during the earlier stages of the case * * *.")

The Beatie bid had a couple of obvious shortcomings. First, the description of the firm's experience was truncated. Second, the firm appears to have completed the fee proposal form erroneously—the increased percentages in Stage 4 are inconsistent with the firm's explanation of its fee proposal. The other bids were all well polished. Each included a thoughtful evaluation of the case, a description of the firm's experience and that of the lawyers who would work on the case, a description of their fee proposal and a fee proposal. Milberg, of course, did not submit a bid.

With respect to the case evaluations, there were no major differences among the firms. Lieff's evaluation was slightly more helpful in that it discussed in some detail the possibility of recovering from Quintus' auditor. This point was also touched on by the other firms. Again, the court lacks a case evaluation from Milberg.

The firms did differ in their experience level. Milberg as discussed previously, has the most experience in the field. Of the firms that submitted bids, Lieff and Weiss appear to have the most experience in securities class action litigation, but Cohen an Berman also make strong showings in this area. Furthermore, Cohen' experience in other types of plaintiff class actions generally is substantial. Berman's retention by institutional investors in two securities cases confirms its experience although it has not demonstrated the same level of experience as Lieff, Weiss and Cohen Finally, Beatie appears to have the least experience, a product perhaps of its comparative youth.

Turning to the lawyers from each firm who would work on the case, the court

begins by noting that little information about Russel H. Beatie, Daniel A. Osborn and Eduard Korinsky is provided by Beatie. Berman offers the biographies of Mr. Tabacco and Mr. Heffelfinger. Both are impressive. Cohen would staff the case with partners Murray T. Lewis and possibly Herbert E. Milstein, Steven J. Toll and Mark S. Willis, and associates Matthew Ide or Tamara Driscoll. Cohen has provided brief biographies for each. Toll and Milstein, as previously mentioned, appear to have excellent experience. Lewis, Ide and Driscoll also appear capable. Lieff offers the services of Elizabeth Cabraser, Richard Heimann, James Finberg and Melanie Piech and provides biographies for each. Ms. Cabraser is superbly qualified and Mr Finberg has a strong resume and proved himself before the undersigned in *In re California Micro Devices Sec. Lit.,* C–94–2817–VRW. Mr Heimann and Ms Piech also appeared very capable. Milberg offers Mr. Lawrence and Mr Coughlin. As discussed, both are very able. Finally, Weiss offers the services of Kevin J. Yourman, Jordan L. Lurie and Mark Gordon. All three appear capable and experienced.

Another quality consideration is the resources that each firm brings to the litigation. Securities class action litigation can become costly and protracted. A firm without the resources to go the distance will be more prone to accept a settlement that is less than the maximum possible recovery. Size is only a rough proxy for resources, but it is a proxy that is easy to measure. Beatie is a small firm with six lawyers. Berman, according to Martindale–Hubbel, has five lawyers in its San Francisco office and 11 in its Boston office. Cohen, again according to Martindale–Hubbel, has 33 lawyers in its Washington DC office. The firm also maintains offices in Seattle and New York. Lieff, according to its firm biography, has 53 lawyers in

four offices (San Francisco, Boston, New York and Nashville). Milberg appears to have approximately 160 lawyers in offices in New York, San Diego, San Francisco, Los Angeles, Boca Raton and Philadelphia. See http://www.milberg.com/attorneys/partners, visited on May 21, 2001. Finally, Weiss appears to be an 18 lawyer firm.

The existence of malpractice insurance is also a proxy for quality for, at least, two reasons. First, of course, even capable lawyers make mistakes and the existence of a source of recovery in the event of a malpractice claim protects a class' recovery. Second, and probably of greater importance, the existence of malpractice insurance means that an underwriter has made at least some evaluation of the risks associated with the firm's practice and has extended coverage.

Weiss is the only firm that is not insured. This is a definite strike against it. At the same time, the insurance coverage the other firms have is not substantial in relation to the exposure for malpractice in a case involving millions in potential recovery. Berman has $2 million in coverage, Beatie $3 million, Cohen $5 million and Lieff $10 million. Thus, the court concludes that Lieff and Cohen have a slight qualitative edge in this regard. The court is unaware whether Milberg presently carries malpractice insurance, but published accounts of the suit by Lexecon Inc. against Milberg suggest that at one point Milberg carried $10 million of malpractice insurance, of which $5 million was available to satisfy judgments against the firm. See, e.g., Paul Elias, *Milberg May Be Short on Coverage,* The Recorder (April 15, 1999).

Finally, the court considers the firms' explanations of their fee proposals. With the exception of Beatie, each firm articu-

lated the rationale underlying its fee proposal structure. The general shape of the fee proposals, decreasing with increasing recovery and increasing as the case progresses, was well explained by each firm that submitted a bid.

Overall, Lieff appears to be qualitatively the top firm of the five that submitted bids. Next are Weiss and Cohen whose resources and experience are both substantial. Close behind is Berman. Finally, the court concludes that although it is certainly a well qualified firm, Beatie made the least impressive showing in terms of the bids submitted. Had Milberg submitted a bid, there would seem to be no question that it would have made a strong showing. Milberg's experience and resources are essentially unrivaled in plaintiff securities class action practice.

But the acid test for any plaintiff firm is its ability produce a superior recovery. In any individual case, the amount of the recovery is the product of many factors, most of which are only indirectly related to the quality of lawyering. These include the strength and availability of evidence and the financial resources of the defendants, among many others. So the success of a plaintiff law firm is the product of at least two skills: (1) case selection, and (2) practice ability. To be sure, these are not wholly independent of one another as good lawyers tend to earn reputations that draw more cases and this increased draw, in turn, allows for more selectivity in picking cases. But these two attributes of a successful plaintiffs' practice do involve different skill sets.

█ Over a large enough sample of cases, the quality of lawyering by a plaintiff law firm should be shown by its ability to recover a greater proportion of the potential available damages than that obtained by lesser quality firms. In light of Milberg's pre-eminence in plaintiff securi-

ties practice, it is logical to ask whether the court's decision not to select Milberg as lead counsel in *Quintus* and *Copper Mountain*, at the rather high fees it proposed sacrifices the quality of the classes' representation simply for a less expensive fee.

Empirical evidence shows that the court's decision did not sacrifice quality for low price. Of the 1,203 federal and 92 state court securities class action filings from 1988 to 1999 analyzed in the *Haas Study*, Milberg served as plaintiff counsel in 31 percent of the cases. *Haas Study* at 13. Milberg cases settled for a median amount that was 61 percent higher than the median settlements involving other attorneys ($4.5 million versus $2.8 million). *Id.* 33 tbl 16. But it seems likely that the larger median settlement Milberg cases is attributable to prudent case selection rather than more skillful lawyering. When the amounts of Milberg and other firms' settlements are measured against potential recoveries, Milberg does no better than other firms in this practice area. See *id.* at 13, 33 tbl. 16.

The *Haas Study*, relied on by the court in reaching this conclusion, measured potential recoveries by calculating the investment losses of the plaintiff class in two ways: (1) an industry-specific index, using the typical plaintiff's proportional decay model for measuring the number of shares affected, and (2) a measure of the highest market capitalization of the issuer's stock during the class period and the market capitalization on the day after the class period. *Id.* at 5–6. The former measure proved to be a much better predictor of the amount of actual settlements. *Id.* at 8. Using the industry-specific index, average Milberg settlements were 15.20 percent of potential recoveries versus 17.39 percent for cases brought by other law firms, *id.* at tbl. 16; median Milberg settlements were

5.46 percent of potential recoveries as opposed to 6.57 percent for other firms. Using the less predictive market drop measures, Milberg did only slightly better than other firms (mean: 5.03 versus 4.93; median: 2.25 versus 2.06). None of this suggests that Milberg is not a capable law firm. But it does suggest that Milberg lacks a qualitative advantage in its practice that entitles it to compensation at a level higher than that acceptable to its competitors. Declining to designate Milberg as class counsel does not sacrifice the quality of the class' representation.

## IV

■ The court next considers the bids quantitatively, focusing on the fee proposals alone. To ease comparison of the fee proposals, the court requested that the firms fill out a grid the court attached as Appendix B to its April 12, 2001, order. Having standardized fee proposals was helpful, but it was difficult to compare the fee proposals just by looking at the percentages proposed. Part of this difficulty was due to the sliding scale nature of the fee proposals. The court could not just compare the percentage proposed in a certain range of recovery. Instead, the court had to consider the effect that the percentages for the preceding ranges would have on a settlement that fell in the range in question. Benefits to the class of a low percentage in the low recovery ranges carry through even if the recovery exceeds those ranges.

To compare the fee proposals more readily, the court found it useful to select a number of hypothetical recoveries and then calculate the fee that that recovery would generate for each firm (and the percentage of total recovery that fee would equal). This had the additional benefit of enabling the court to factor in Weiss and Berman's exclusion of costs from its portion of recovery. Weiss' proposed percentages do not include costs up to certain amounts; instead costs are to be paid out of the class' recovery, up to $150,000 or $300,000, depending on the stage of recovery. Similarly, Berman's fee proposal does not include costs for recoveries from $0 to $4 million that occur in Stage 1. To calculate the total amount taken out of the class' recovery by each firm at each stage, the court assumed that costs would reach the caps imposed by Weiss and Berman. While this approach partially penalizes Weiss and Berman, the court notes that any handicap to these firms is the product of not following the court's instructions.

The court calculated fees and fee percentages for recoveries of $2, $6, $10, $14, $18, $24 and $36 million. While Milberg did not submit a formal bid to be considered, the court calculated the percentages and fees that would be generated by the fee agreement that Milberg announced to the court in connection with the selection of lead plaintiff. The calculation was done simply for purposes of comparison. By failing to submit a bid, Milberg has taken itself out of consideration for the position of lead counsel. This is unfortunate, because at some levels of recovery, the Milberg fee proposal is attractive and, in any event, would have warranted consideration in *Quintus*.

Firm by firm calculations are shown in the tables below. These tables show fees (and costs) as a percentage of total recover at each hypothesized recovery level and stage of recovery. Calculating these percentages was a simple exercise using the percentages proposed by each firm, shown in the tables above, and the hypothesized recovery amounts.

From these percentages of total recovery, the court constructed a matrix by placing amount of recovery on one axis and stage of recovery on the other. In each cell, the firms' proposals are ranked from first to sixth, with first being the proposal most beneficial to the class. Next to the fee percentage for each firm is the dollar amount that would be excluded from the recovery as fees and costs. The matrix is reproduced on the next page.

**Beatie**

|  | Stage 1 | Stage 2 | Stage 3 | Stage 4 |
|---|---|---|---|---|
| $2 million | 0.0% | 0.0% | 0.0% | 30.0% |
| $6 million | 6.0% | 7.0% | 8.0% | 30.0% |
| $10 million | 10.2% | 12.0% | 13.8% | 30.0% |
| $14 million | 11.6% | 13.7% | 15.9% | 30.0% |
| $18 million | 11.8% | 14.2% | 16.5% | 30.0% |
| $24 million | 11.5% | 14.0% | 16.5% | 29.2% |
| $36 million | 11.0% | 13.7% | 16.4% | 27.8% |

**Berman**

|  | Stage 1 | Stage 2 | Stage 3 | Stage 4 |
|---|---|---|---|---|
| $2 million | 5.0% | 5.0% | 7.0% | 10.0% |
| $6 million | 3.3% | 6.0% | 8.0% | 11.7% |
| $10 million | 6.0% | 9.2% | 11.8% | 16.0% |
| $14 million | 8.6% | 12.3% | 15.6% | 20.0% |
| $18 million | 9.2% | 13.2% | 16.8% | 21.4% |
| $24 million | 9.0% | 13.1% | 16.8% | 21.5% |
| $36 million | 8.7% | 12.8% | 16.2% | 21.0% |

**Cohen**

|  | Stage 1 | Stage 2 | Stage 3 | Stage 4 |
|---|---|---|---|---|
| $2 million | 13.0% | 17.0% | 19.0% | 20.0% |
| $6 million | 12.8% | 16.8% | 18.8% | 19.8% |
| $10 million | 12.4% | 16.4% | 18.4% | 19.4% |
| $14 million | 12.1% | 16.1% | 18.1% | 19.1% |
| $18 million | 11.9% | 15.9% | 17.9% | 18.9% |
| $24 million | 11.5% | 15.5% | 17.5% | 18.5% |
| $36 million | 11.0% | 15.0% | 17.0% | 18.0% |

**Lieff**

|  | Stage 1 | Stage 2 | Stage 3 | Stage 4 |
|---|---|---|---|---|
| $2 million | 12.0% | 18.0% | 22.0% | 23.0% |
| $6 million | 11.7% | 17.7% | 21.7% | 22.7% |
| $10 million | 11.2% | 17.2% | 21.2% | 22.2% |
| $14 million | 10.9% | 16.9% | 20.9% | 21.9% |
| $18 million | 10.5% | 16.5% | 20.5% | 21.5% |
| $24 million | 10.0% | 16.0% | 20.0% | 21.0% |
| $36 million | 9.3% | 15.3% | 19.3% | 20.3% |

**Milberg**

|  | Stage 1 | Stage 2 | Stage 3 | Stage 4 |
|---|---|---|---|---|
| $2 million | 5.0% | 5.0% | 5.0% | 5.0% |
| $6 million | 7.5% | 7.5% | 7.5% | 7.5% |
| $10 million | 10.5% | 10.5% | 10.5% | 10.5% |
| $14 million | 12.5% | 12.5% | 12.5% | 12.5% |
| $18 million | 14.4% | 14.4% | 14.4% | 14.4% |
| $24 million | 17.7% | 17.7% | 17.7% | 17.7% |
| $36 million | 21.8% | 21.8%% | 21.8% | 21.8% |

**Weiss**

|  | Stage 1 | Stage 2 | Stage 3 | Stage 4 |
|---|---|---|---|---|
| $2 million | 15.0% | 16.0% | 24.0% | 24.0% |
| $6 million | 9.8% | 10.8% | 13.8% | 13.8% |
| $10 million | 8.6% | 9.6% | 11.6% | 11.6% |
| $14 million | 7.9% | 8.9% | 10.5% | 10.5% |
| $18 million | 7.4% | 8.4% | 9.7% | 9.7% |
| $24 million | 6.9% | 7.7% | 8.8% | 8.8% |
| $36 million | 6.3% | 7.0% | 7.9% | 7.9% |

## Comparison of Fees at Different Levels of Recovery and Different Stages

| Recovery | Stage 1 Firm | % | Fee | Stage 2 Firm | % | Fee | Stage 3 Firm | % | Fee | Stage 4 Firm | % | Fee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $2,000,000 | Beatie | 0.0% | $0 | Beatie | 0.0% | $0 | Beatie | 0.0% | $0 | Milberg | 5.0% | $100,000 |
| | Berman | 5.0% | $100,000 | Berman | 5.0% | $100,000 | Milberg | 5.0% | $100,000 | Berman | 10.0% | $200,000 |
| | Milberg | 5.0% | $100,000 | Milberg | 5.0% | $100,000 | Berman | 7.0% | $140,000 | Cohen | 20.0% | $400,000 |
| | Lieff | 12.0% | $240,000 | Weiss | 16.0% | $320,000 | Cohen | 19.0% | $380,000 | Lieff | 23.0% | $460,000 |
| | Cohen | 13.0% | $260,000 | Cohen | 17.0% | $340,000 | Lieff | 22.0% | $440,000 | Weiss | 24.0% | $480,000 |
| | Weiss | 15.0% | $300,000 | Lieff | 18.0% | $360,000 | Weiss | 24.0% | $480,000 | Beatie | 30.0% | $600,000 |
| $6,000,000 | Berman | 3.3% | $198,000 | Berman | 6.0% | $360,000 | Milberg | 7.5% | $450,000 | Milberg | 7.5% | $450,000 |
| | Beatie | 6.0% | $360,000 | Beatie | 7.0% | $420,000 | Berman | 8.0% | $480,000 | Berman | 11.7% | $702,000 |
| | Milberg | 7.5% | $450,000 | Milberg | 7.5% | $450,000 | Beatie | 8.0% | $480,000 | Weiss | 13.8% | $828,000 |
| | Weiss | 9.8% | $588,000 | Weiss | 9.8% | $588,000 | Weiss | 13.8% | $828,000 | Cohen | 19.8% | $1,188,000 |
| | Lieff | 11.7% | $702,000 | Lieff | 11.7% | $702,000 | Cohen | 18.8% | $1,128,000 | Lieff | 22.7% | $1,362,000 |
| | Cohen | 12.8% | $768,000 | Cohen | 12.8% | $768,000 | Lieff | 21.7% | $1,302,000 | Beatie | 30.0% | $1,800,000 |
| $10,000,000 | Berman | 6.0% | $600,000 | Berman | 9.2% | $920,000 | Milberg | 10.5% | $1,050,000 | Milberg | 10.5% | $1,050,000 |
| | Weiss | 8.6% | $860,000 | Weiss | 9.6% | $960,000 | Weiss | 11.6% | $1,160,000 | Weiss | 11.6% | $1,160,000 |
| | Beatie | 10.2% | $1,020,000 | Milberg | 10.5% | $1,050,000 | Berman | 11.8% | $1,180,000 | Berman | 16.0% | $1,600,000 |
| | Milberg | 10.5% | $1,050,000 | Beatie | 12.0% | $1,200,000 | Beatie | 13.8% | $1,380,000 | Cohen | 19.4% | $1,940,000 |
| | Lieff | 11.2% | $1,120,000 | Cohen | 16.4% | $1,640,000 | Cohen | 18.4% | $1,840,000 | Lieff | 22.2% | $2,220,000 |
| | Cohen | 12.4% | $1,240,000 | Lieff | 17.2% | $1,720,000 | Lieff | 21.2% | $2,120,000 | Beatie | 30.0% | $3,000,000 |
| $14,000,000 | Weiss | 7.9% | $1,106,000 | Weiss | 8.9% | $1,246,000 | Weiss | 10.5% | $1,470,000 | Weiss | 10.5% | $1,470,000 |
| | Berman | 8.6% | $1,204,000 | Berman | 12.3% | $1,722,000 | Milberg | 12.5% | $1,750,000 | Milberg | 12.5% | $1,750,000 |
| | Lieff | 10.5% | $1,470,000 | Milberg | 12.5% | $1,750,000 | Berman | 15.6% | $2,184,000 | Cohen | 19.1% | $2,674,000 |
| | Beatie | 11.6% | $1,624,000 | Beatie | 13.7% | $1,918,000 | Beatie | 15.9% | $2,226,000 | Berman | 20.0% | $2,800,000 |
| | Cohen | 12.1% | $1,694,000 | Cohen | 16.1% | $2,254,000 | Cohen | 18.1% | $2,534,000 | Lieff | 21.9% | $3,066,000 |
| | Milberg | 12.5% | $1,750,000 | Lieff | 16.9% | $2,366,000 | Lieff | 20.9% | $2,926,000 | Beatie | 30.0% | $4,200,000 |
| $18,000,000 | Weiss | 7.4% | $1,332,000 | Weiss | 8.4% | $1,512,000 | Weiss | 9.7% | $1,746,000 | Weiss | 9.7% | $1,746,000 |
| | Berman | 9.2% | $1,656,000 | Berman | 13.2% | $2,376,000 | Milberg | 14.4% | $2,592,000 | Milberg | 14.4% | $2,592,000 |
| | Lieff | 10.5% | $1,890,000 | Beatie | 14.2% | $2,556,000 | Beatie | 16.5% | $2,970,000 | Cohen | 18.9% | $3,402,000 |
| | Beatie | 11.8% | $2,124,000 | Milberg | 14.4% | $2,592,000 | Berman | 16.8% | $3,024,000 | Berman | 21.4% | $3,852,000 |
| | Cohen | 11.9% | $2,142,000 | Cohen | 15.9% | $2,862,000 | Cohen | 17.9% | $3,222,000 | Lieff | 21.5% | $3,870,000 |
| | Milberg | 14.4% | $2,592,000 | Lieff | 16.5% | $2,970,000 | Lieff | 20.5% | $3,690,000 | Beatie | 30.0% | $5,400,000 |
| $24,000,000 | Weiss | 6.9% | $1,656,000 | Weiss | 7.7% | $1,848,000 | Weiss | 8.8% | $2,112,000 | Weiss | 8.8% | $2,112,000 |
| | Berman | 9.0% | $2,160,000 | Berman | 13.1% | $3,144,000 | Beatie | 16.5% | $3,960,000 | Milberg | 17.7% | $4,248,000 |
| | Lieff | 10.0% | $2,400,000 | Beatie | 14.0% | $3,360,000 | Berman | 16.8% | $4,032,000 | Cohen | 18.5% | $4,440,000 |
| | Beatie | 11.5% | $2,760,000 | Cohen | 15.5% | $3,720,000 | Cohen | 17.5% | $4,200,000 | Lieff | 21.0% | $5,040,000 |
| | Cohen | 11.5% | $2,760,000 | Lieff | 16.0% | $3,840,000 | Milberg | 17.7% | $4,248,000 | Berman | 21.5% | $5,160,000 |
| | Milberg | 17.7% | $4,248,000 | Milberg | 17.7% | $4,248,000 | Lieff | 20.0% | $4,800,000 | Beatie | 29.2% | $7,008,000 |
| $36,000,000 | Weiss | 6.3% | $2,268,000 | Weiss | 7.0% | $2,520,000 | Weiss | 7.9% | $2,844,000 | Weiss | 7.9% | $2,844,000 |
| | Berman | 8.7% | $3,132,000 | Berman | 12.8% | $4,608,000 | Berman | 16.2% | $5,832,000 | Cohen | 18.0% | $6,480,000 |
| | Lieff | 9.3% | $3,348,000 | Beatie | 13.7% | $4,932,000 | Beatie | 16.4% | $5,904,000 | Lieff | 20.3% | $7,308,000 |
| | Beatie | 11.0% | $3,950,000 | Cohen | 15.0% | $5,400,000 | Cohen | 17.0% | $6,120,000 | Berman | 21.0% | $7,560,000 |
| | Cohen | 11.0% | $3,960,000 | Lieff | 15.3% | $5,508,000 | Lieff | 19.3% | $6,948,000 | Milberg | 21.8% | $7,848,000 |
| | Milberg | 21.8% | $7,848,000 | Milberg | 21.8% | $7,848,000 | Milberg | 21.8% | $7,848,000 | Beatie | 27.8% | $10,008,000 |

The creation of this matrix allowed the court to compare the different proposals quite readily. It is apparent that no single proposal is best in all cells of the matrix. But it is also apparent that one fee proposal stands out as the most advantageous to the class in a substantial number of cells. Overall, the Weiss proposal was best in 16 of the 28 different cells. The next best fee was Milberg's, finishing first in five cells. Berman's proposal was first in four cells and Beatie's in three. Weiss' proposal was the clear winner once recovery was at or above $14 million. For a recovery at or above that amount, the Weiss proposal was best for the class regardless of the stage of recovery. The Beatie proposal was best for the lowest level of recovery, as long as it occurred at or before trial. Berman's proposal was most advantageous for recoveries of $6 million or $10 million in Stages 1 and 2. The Lieff and Cohen proposals were never the most attractive.

Lieff's proposal was least attractive for the class in seven cells, Beatie six, Milberg six, Cohen three and Weiss two. Berman's proposal was never the worst for the class. The Weiss proposal was less advantageous for low levels of recovery due to its relatively high percentages at low recoveries and the court's assumption about litigation costs necessitated by Weiss' failure to conform to the court's request. The Milberg proposal generated high fees for high recoveries, as expected given the increasing nature of its structure. Beatie's

proposal generated a high fee for recoveries in Stage 4; it was the least attractive proposal in Stage 4 for all levels of recovery. Lieff's proposal was unattractive in Stages 2 and 3.

But the court cannot simply add up the first place victories and call it a day. Some of the cells are more meaningful than others. It is not equally likely that a recovery will fall in any given cell. In the undersigned's experience, securities class action recoveries are most likely to occur in Stages 2 and 3. After the passage of the PSLRA, settlement before a motion to dismiss is less likely. By raising the standard for pleading fraud, the PSLRA encourages defendants to bring a motion to dismiss rather than settle before that point. The notion that the passage of the PSLRA will cause defendants to eschew early settlement finds support in the *Haas Study*. See *Haas Study* at 5, 17 tbl. 2. But also unlikely is recovery in Stage 4, after trial and during appeal. Few securities class action cases make it that far.

Furthermore, not all levels of recovery are equally likely. The firms all seem to agree that a recovery of some kind will occur because they assert that the evidence of liability is strong. Beatie and Lieff have conservatively measured the potential investor loss at upwards of $60 million. Beatie estimates that a more liberal estimate would put damages at around $1 billion although a recovery of that amount seems highly unlikely given the limited funding sources. If the court assumes that the $60 million figure is accurate, it can estimate recovery by multiplying that potential investor loss (PIL) by the average settlement/PIL ratio determined by the *Haas Study*. The average settlement/PIL ratio, with PIL measured by the "industry index" approach, was 16.66 percent. *Id.* at 24 tbl. 7. Using this approach in conjunction with the firms'

defendant style loss estimate will generate a recovery estimate that is on the low end. This is because the 16.6 percentage from the *Haas Study* was determined using plaintiff style loss estimates, which are greater than defendant style calculations and thus lead to a lower average settlement/PIL ratio than if defendant style calculations were used.

The result of employing the *Haas Study* average settlement/PIL ratio is an expected recovery of $9,996,000. This is consistent with Weiss' estimate that recovery would be between $4 and $33 million and Berman's estimate that it would fall between $10 and $35 million, or more likely, $12 and $18 million. As discussed above, however, $9,996,000 is likely a conservative estimate. The firms' claims of strong evidence of liability in this case also justify an expected settlement higher than the $9,996,000 estimate determined using the average settlement/PIL ratio. But see *Haas Study* at 7 (80 percent of settled cases settled for less than $10 million). At the same time, plaintiffs are going to have trouble finding deep pockets in this case. Quintus Corporation is in bankruptcy. The firms presume that director and officer insurance is a source of recovery but that has not yet been confirmed. There is no evidence that a large award can be recovered from the individual defendants. Consequently, obtaining a large settlement may be difficult in this case. Thus, the court concludes that recovery of an amount over $24 million is unlikely. Taking all of this into account, while being conservative, the court concludes that a recovery range of $6 to $24 million is an appropriate range for weighting the cells of the fee proposal matrix. This leaves a likelihood of recovery between $6 million and $24 million occurring in Stages 2 or 3, creating ten different cells on which to focus in selection of counsel.

In these ten cells, the Weiss fee proposal is the most advantageous for the class in six. Berman and Milberg's fees are most attractive in two cells each. In these four cells, the Weiss fee proposal is second in two and fourth in two. The Lieff fee proposal performed the worst, finishing last eight out of ten times The mean average rank of each of the six firms in these ten cells was:

| Firm | Avg Rank |
|------|----------|
| Weiss | 1.8 |
| Berman | 2.3 |
| Milberg | 3.0 |
| Beatie | 3.2 |
| Cohen | 4.9 |
| Lieff | 5.8 |

The result is clear: quantitatively, in the cells that would appear to matter most, the Weiss fee proposal is the best for the class, placing first or second in eight of ten cells. The Berman, Milberg and Beatie fees also performed well, but not nearly as well as the Weiss fee proposal. The average savings to the class generated by the Weiss fee proposal in the ten cells in consideration is $485,400. Had the court not assumed that expenses would equal the expense caps Weiss proposes, the Weiss bid would have been even more advantageous to the class.

V

Comparing the quantitative factors and the qualitative factors can be a difficult task. If the qualitatively better firms charge more, the court must evaluate whether the firms are worth the premium. In *Quintus*, however, a clear winner emerges. The Weiss firm combines both high quality and low price. Weiss was the clear quantitative winner and at the same time it submitted a bid that reflected and described an experienced, high quality firm. The firm documented extensive securities litigation experience by the firm and the lawyers who would run the litiga-

tion. The bid had some shortcomings: Weiss is self-insured and the fee proposal failed to conform to the court's request. Neither deficiency, however, is substantial enough to overcome the qualitative and cost advantages the firm offers.

Qualitatively, Weiss did not make the best presentation, but it was near the top. The Lieff firm, whose presentation the court deemed qualitatively the strongest, could not keep up with Weiss when it came to price competition. Had Lieff's fee proposal been close to that of Weiss, the court would have faced a more difficult cost/quality trade-off. But Lieff's last place quantitative finish prevents the firm from being named over Weiss. The Cohen firm's presentation is probably Weiss' qualitative equal, but the poor showing of its fee proposal forecloses its selection. Beatie and Berman submitted competitive fee proposals and quality bids, but they could not match Weiss' combination of a fair fee and extensive experience.

As an aside, the court notes that Milberg might have done respectably in this competition had it chosen to submit a bid. The fee it arranged with its group of lead plaintiffs, which included nominal lead plaintiff Hill, matched up reasonably well with Weiss' fee proposal at lower recovery levels. Milberg's proposal suffers badly at higher levels of recovery because of its increasing percentages. The firm's insistence on this "incentivized" increasing percentage seems mystifying. Most recoveries in securities class actions are at levels ($10 million and under) at which Milberg is willing to accept a fee that is competitive with those of other firms. When the very high percentages Milberg insists upon for higher levels of recovery are factored in, the Milberg fee proposal becomes highly uncompetitive. Even if recovery at the higher levels is not likely, such an outcome would have to be quite remote to allow a

fiduciary for the class simply to ignore the possibility that the increasing percentage will create a windfall for the attorneys at the class' expense. Whether Milberg could have pointed out some qualitative advantage had it submitted a bid is possible, of course. But in light of the fact that Milberg's representation of investor classes appears to produce no higher recoveries than that of other firms in this practice, a qualitative factor in Milberg's favor seems doubtful. Milberg, in any event, submitted no bid and has expressed no interest in further consideration in this litigation.

## VI

Competitive determination of class counsel fees does not always require a court auction of the type conducted in *Quintus*. In *Copper Mountain*, plaintiff Barton negotiated a fee proposal that was significantly more beneficial for the class than the rival Milberg fee proposal negotiated by the Copper Mountain Investors (CMI). As noted above, both Beatie and Milberg are competent to undertake the representation; Milberg made no suggestion to the contrary. Barton appeared at the hearing and demonstrated interest and competence. This demonstration, in combination with the attractiveness of the fee Barton negotiated with Beatie, allowed the court to determine that Barton satisfied the requirements of F.R.C.P. 23 and was the most adequate plaintiff under the PSLRA, 15 U.S.C. § 77z–1(3)(B)(iii)(I), § 78u–4(a)(3)(B)(iii)(I). For this reason, the court appointed Barton lead plaintiff and approved his choice of counsel.

The fee proposal submitted by Beatie in *Copper Mountain* was as follows:

| Recovery | Fee Percentage | Fee Cap |
|---|---|---|
| $0 to $20 million | 15.0% | $2 million |
| $20 to 40 million | 12.0% | $4 million |
| over $40 million | 10.0% | $8 million |

The fee proposal did not use the sliding scale approach seen in the *Quintus* bids discussed above. The proposal employed fee caps and excluded expenses.

The competing Milberg proposal in *Copper Mountain* was as follows:

| Recovery | Fee Percentage |
|---|---|
| $0 to $10 million | 20.0% |
| $10 to 25 million | 25.0% |
| over $25 million | 30.0% |

Milberg's fee proposal, in contrast to Beatie's, included costs and used the sliding scale method. In *Copper Mountain*, however, these advantages of the Milberg proposal were not enough to overcome the substantially smaller fees proposed by Beatie. Against this stems largely from the very high percentage that Milberg demands for high levels of recovery.

To be sure, some features of the Beatie fee proposal do not seem optimal. If the court assumes costs of $0.5 million, the Beatie fee proposal is not more favorable than Milberg's until recovery reaches $10 million. At lower cost figures, however, the Beatie proposal is better for the class at lower recoveries. For example, if costs amount to $0.375, $0.25 or $0.125 million, Beatie's fee proposal is more attractive at all recoveries greater than $7.5, $5 and $2.5 million, respectively.

Predicting the ultimate recovery and the amount of litigation costs is difficult, but the point is that the terms of Barton's deal with Beatie were agreed to by an informed, competent and interested class member who was in a position to assess the possibilities of various recoveries and, too, is in a position to have some say in the costs incurred in the litigation. Even if Barton's fee arrangement with Beatie is not better at every possible recovery and cost level, the arrangement is superior for

the class at far more recovery and cost levels than the arrangement negotiate by the Milberg clients. The court is not inclined to substitute it judgment for that of a class member that has obtained superior term with counsel. But see *In re Cendant Corp. Lit.*, 182 F.R.D. 144, 151 (D.N.J. 1998). Because Barton did so, the court determined that he was the most adequate plaintiff under the PSLRA.

### VII

For the above stated reasons, the court appoints Weiss & Yourman as lead counsel in *Quintus* on the fee arrangement terms contained in its bid. In the court's April 12, 2001, consolidation order it stated:

> Unless otherwise agreed between the parties, lead plaintiff shall file a consolidated class action complaint no later than 60 days from the date of final selection of lead plaintiff and counsel. The consolidated class action complaint shall be treated as if it were the original complaint, and all defendants shall have 45 days after the filing and service of the consolidated class action complaint to answer or otherwise respond. Notwithstanding the filing of the consolidated class action complaint pursuant to F.R.C.P. 15(a), in the event that defendants file any motions directed at the consolidated class action complaint, counsel are to meet and confer and report to the court with regard to an acceptable briefing and hearing schedule for such motions. The briefing schedule, however, shall be governed by the local rules unless the court orders otherwise.

4/12/01 Order (Doc. # 71) at 4.

The selection of lead counsel in both *Quintus* and *Copper Mountain* has now become final. In *Copper Mountain*, the court reaffirms its designation of Quinn Barton as lead plaintiff and Beation &

Osborn as lead counsel. In *Quintus*, the court appoints Weiss & Yourman as lead counsel. The clerk is directed to unseal the bids filed by prospective lead counsel in *Quintus*.

IT IS SO ORDERED.